UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD FICHTL,

                              Plaintiff,

          -against-

FIRST UNUM LIFE INSURANCE COMPANY,

                              Defendant.

Case No. 1:22-cv-06932 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Richard Fichtl ("Plaintiff") brings this action against First Unum Life Insurance Company ("Unum" or "Defendant") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* ECF No. 1 ("Compl."). Plaintiff challenges Defendant's decision to terminate benefits under two insurance plans. *Id.* ¶¶ 14-44.

The parties have fully briefed cross-motions for judgment on the administrative record. ECF Nos. 35-1 ("Def. Br."), 36 ("Pl. Br."), 37 ("Pl. Opp."), 39 ("Def. Opp."), 42 ("Def. Reply"), 43 ("Pl. Reply"); *see* ECF Nos. 34-1 through 34-12 (collectively, "Admin. R."); *see also* Pl. Br. at 2-13 ("PSOF"); ECF Nos. 35-7 ("DSOF"), 38 ("Pl. RSOF"), 39-1 ("Def. RSOF"). Both parties have "clear[ly] . . . consent[ed]" to conducting "essentially a bench trial on the papers with the [d]istrict [c]ourt acting as the finder of fact." *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 642 F.3d 110, 116 (2d Cir. 2011) (quotation marks and citation omitted); *see* Pl. Br. at 1; Def. Br. at 13-14. The Court must therefore "make explicit findings of fact and conclusions of law explaining the reasons for its decision" under Federal Rule of Civil Procedure 52(a). *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003). For the following reasons, the Court grants Plaintiff's motion and denies Defendant's motion.

## FINDINGS OF FACT[1]

### I.   The Plans

Plaintiff was a longtime employee of NewYork-Presbyterian Hospital ("NYPH").

Admin. R. at 5:186.  As an employee of NYPH, Plaintiff participated in two NYPH-sponsored

insurance policies issued and administered by Defendant: (1) the NewYork-Presbyterian

Hospital Group Long Term Disability Insurance Policy; and (2) the NewYork-Presbyterian

Hospital Group Life Insurance Policy.  Def. RSOF ¶¶ 1, 5; Compl. ¶¶ 7, 9; ECF No. 22

("Ans.") ¶¶ 7, 9; *see* Admin. R. at 1:175-218 (the "LTD Plan"); *id.* at 10:194-11:45 (the "Life

Plan").  In their cross-motions, the parties do not contest that each policy is an "employee

benefit plan" governed by ERISA.  *See* 29 U.S.C. § 1002(3) (defining "employee benefit

plan"); *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) ("Rules governing collection of

---

[1] Review of a benefits decision under ERISA "is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence." *Muller*, 341 F.3d at 125 (quoting *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 67 (2d Cir. 1997)); *accord Salisbury v. Prudential Ins. Co. of Am.*, 238 F. Supp. 3d 444, 451 (S.D.N.Y. 2017).  "As neither party has argued that there is good cause to review evidence beyond the administrative record, the Court bases its holding on the record." *Brightman v. 1199SEIU Health Care Emps. Pension Fund*, No. 18-cv-04932 (LJL), 2021 WL 809373, at *9 (S.D.N.Y. Mar. 2, 2021).  The Court also appropriately considers judicial admissions.  *See In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020) (per curiam) ("A judicial admission is a statement made by a party or its counsel which has the effect of withdrawing a fact from contention and which binds the party making it throughout the course of the proceeding.").

At various points in its papers, Defendant asserts that it "cannot admit or deny the truth of" certain statements because "the document [in the administrative record] cited by Plaintiff does not contain anything other than Plaintiff's own statements, which do not equate to undisputed facts."  *See, e.g.*, Def. RSOF ¶ 8.  As Defendant elsewhere recognizes, however, the Court is the factfinder here.  *See, e.g.*, Def. Br. at 13 ("Defendants should be granted judgment on the administrative record by conducting essentially a bench trial on the papers *with the District Court as the finder of fact*." (quotation marks and citation omitted; emphasis added)).  Therefore, the Court may properly resolve disputes of fact, if any.

The Court's findings of fact are primarily contained in this section but appear as well in its conclusions of law.

premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan.").  Several portions of each plan are especially relevant to this case.

### A.  The LTD Plan

The LTD Plan states in relevant part:

> *HOW DOES UNUM DEFINE DISABILITY?*
>
> You are disabled when Unum determines that:
>
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.
>
> You must be under the regular care of a physician in order to be considered disabled.
>
> We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination.  We can require an examination as often as it is reasonable to do so.  We may also require you to be interviewed by an authorized Unum Representative.
>
> *HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?*
>
> You must be continuously disabled through your **elimination period**.  Unum will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.
>
> Your elimination period is 180 days.

> You are not required to have a 20% or more loss in your
> indexed monthly earnings due to the same injury or sickness to
> be considered disabled during the elimination period.
>
> . . .
>
> ### WHAT DISABILITIES HAVE A LIMITED PAY PERIOD UNDER YOUR PLAN?
>
> The lifetime cumulative maximum benefit period for all
> disabilities due to **mental illness** and alcoholism or drug abuse
> is 24 months.  Only 24 months of benefits will be paid for any
> combination of such disabilities even if the disabilities:
>
> - are not continuous; and
> - are not related.

Admin. R. at 1:189, 1:195.

The LTD Plan defines "material and substantial duties" as duties that (1) "are normally required for the performance of your regular occupation" and (2) "cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week."  *Id.* at 1:204.  The LTD Plan defines "regular occupation" as "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.* at 1:206.  The LTD Plan defines "gainful occupation" as "an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work."  *Id.* at 1:203.

### B.  The Life Plan

The Life Plan states that "[p]remium payments are *required* for an insured while he or she is disabled under this plan.  The initial premium for each plan is based on the initial rate(s) shown in the policy effective on the Employer's original plan effective date."  *Id.* at 10:212.

4

There is an exception, however: the "premium waiver." *Id.* (emphasis and capitalization omitted).  Under that provision, "Unum does not require premium payments for an insured employee's life coverage if he or she is under age 65 and disabled for 6 months.  Proof of disability, provided at the insured employee's expense, must be filed by the insured employee and approved by Unum." *Id.*  Elsewhere, the Life Plan states:

> **WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?**
>
> If your claim is based on your disability, your proof of claim, provided at Unum's expense, must show:
>
> - that you are under the regular care of a physician;
> - the date your disability began;
> - the cause of your disability;
> - the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation or any gainful occupation; and
> - the name and address of any hospital or institution where you received treatment, including all attending physicians.
>
> We may request that you send proof of continuing disability indicating that you are under the regular care of a physician. This proof, provided at your expense, must be received within 45 days of a request by us.
>
> If claim is based on death, proof of claim, provided at your or your authorized representative's expense, must show the cause of death.  Also a certified copy of the death certificate must be given to us.
>
> In some cases, you will be required to give Unum authorization to obtain additional medical and non-medical information as part of your proof of claim or proof of continuing disability. Unum will deny your claim if the appropriate information is not submitted.

*Id.* at 10:205-06.  The Life Plan further provides:

> The Plan, acting through the Plan Administrator, delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan.  Unum and Unum Group may act directly or through their employees and agents or further delegate their authority through contracts, letters or

other documentation or procedures to other affiliates, persons or
entities.  Benefit determinations include determining eligibility
for benefits and the amount of any benefits, resolving factual
disputes, and interpreting and enforcing the provisions of the
Plan.  All benefit determinations must be reasonable and based
on the terms of the Plan and the facts and circumstances of each
claim.

*Id.* at 11:43.

## II.   Plaintiff's Benefits Claims and Determinations

### A.  Plaintiff's Claim and Initial Approval

Plaintiff earned his Doctor of Pharmacy from the Virginia Commonwealth University

School of Medicine in 1987.  *Id.* at 5:187.  He spent the next three decades working at medical

institutions in New York City.  *Id.* at 5:186-87.

Plaintiff's last position was Director of Pharmacy IT, Finance, and Formulary

Management at NYPH.  *Id.* at 5:186; Def. RSOF ¶ 7.  In this role, his duties included:

(1) supervising over 750 full-time employees, including management and staff responsible for

pharmacy information technology and drug acquisition; (2) overseeing the NYPH

system's acquisition of pharmaceuticals with an annual budget of approximately $340 million;

(3) leading the Formulary and Therapeutics Committee and various subcommittees

developing medication-use policy throughout NYPH; (4) managing system-wide compliance

with local, state, and national regulatory requirements; (5) overseeing research and

investigational drug services; and (6) coordinating communication with other hospital

departments regarding medication management.  PSOF ¶ 9; Admin. R. at 1:69-70, 5:160-61.

At the time, NYPH consisted of at least eight facilities, including hospitals in Manhattan,

Brooklyn, Queens, Westchester County, and the Hudson Valley.  PSOF ¶¶ 8, 10; Admin. R. at

5:160.  Plaintiff often traveled between these various sites for work.  PSOF ¶ 10; Admin. R. at

1:75.

In the last week of December 2017, Plaintiff filed a claim with Defendant for short-term-disability benefits in anticipation of a laparoscopic partial colectomy due to sigmoid diverticulitis.  DSOF ¶ 1; Def. RSOF ¶ 13.[2]  In support of this claim, Plaintiff submitted an attending-physician statement by Michael Lieberman, M.D.  Admin. R. at 1:59-60; DSOF ¶ 1; *see* Admin. R. at 1:88 (identifying general surgery as Dr. Lieberman's specialty).  On January 4, 2018, Plaintiff underwent the colectomy, after which he stopped working.  Admin. R. at 1:12; Def. RSOF ¶ 13.

Defendant requested updated information about Plaintiff's medical condition from Dr. Lieberman on March 5, 2018.  DSOF ¶ 2.  In a response two days later, Dr. Lieberman stated that he was advising Plaintiff to remain out of work beyond March 4, 2018, but that he believed that Plaintiff would be able to return to work by April 9, 2018.  Admin. R. at 1:82-84.  Dr. Lieberman noted that Plaintiff's symptoms included fatigue, decreased appetite, incisional pain, forgetfulness, and low exercise tolerance.  *Id.* at 1:82.

Defendant also requested updated information on April 9, 2018, from Plaintiff's treating physician, Pamela Eliach, M.D.  DSOF ¶ 3; *see* Def. RSOF ¶ 23 (identifying internal

---

[2] "A colectomy is an operation to remove part or all of [someone's] colon. . . .  Laparoscopic surgery is performed through several small incisions, using the aid of a tiny video camera called a laparoscope."  *Colectomy (Bowel Resection Surgery)*, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/4671-colectomy-bowel-resection-surgery [https://perma.cc/W95M-EVN8] (last updated Apr. 24, 2022) (emphasis omitted).

"Diverticula are small pouches, or sacs, that bulge outward through weak spots in [someone's] colon.  They mostly form in the lower part of the colon. . . .  Diverticulitis is the name for the condition [someone] ha[s] when one or more of the pouches get inflamed."  *Diverticulosis and Diverticulitis*, Nat'l Libr. Med., https://medlineplus.gov/diverticulosisanddiverticulitis.html [https://perma.cc/432J-456Q] (last updated Feb. 21, 2024).

The sigmoid colon is "the contracted and crooked part of the colon immediately above the rectum."  *Sigmoid colon*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sigmoid%20colon [https://perma.cc/7892-7H49].

medicine as Dr. Eliach's specialty).  In a response two days later, Dr. Eliach stated that she was advising Plaintiff to remain out of work beyond April 16, 2018, because he was "unable to function at his previous job at this time."  Admin. R. at 1:115, 1:117.  She added that Plaintiff was suffering from abdominal pain, nausea, vomiting, and weakness, and that physical activity "exacerbated" the abdominal pain – indeed, Plaintiff could not "walk more than a few steps without pain," and he "became winded dressing for [the] office visit today." *Id.* at 1:115-16.  Further, Plaintiff's concentration was "poor," he was "easily distracted," and he could not "focus on simple tasks."  *Id.* at 1:116.  Dr. Eliach expected that Plaintiff could potentially return to work by May 7, 2018, but that he might need to work from home depending on his status.  *Id.*  He continued his treatment with Dr. Eliach and, in a follow-up letter on June 26, 2018, she opined that, following Plaintiff's office visit on June 20, 2018, Plaintiff was still unable to return to work.  *Id.* at 1:228.

On June 21, 2018, Plaintiff filed a claim with Defendant for long-term-disability benefits ("LTD benefits").  DSOF ¶ 5.  On July 2, 2018, Defendant had Deborah Maxcy conduct a vocational review of Plaintiff's occupation.  *Id.* ¶ 8.  Upon reviewing the relevant documents, Maxcy concluded that Plaintiff's "occupation in the national economy [wa]s best identified [as] Director IT Operations," which "involve[d] directing, planning and scheduling the development, production, and administrative processing of the organization's computer operations."  Admin. R. at 1:281.  This occupation's physical requirements included "[o]ccasional exertion" of up to 10 pounds and "mostly sitting, [with] brief periods of standing and walking."  *Id.* at 1:282; *see id.* (defining "[o]ccasionally" as "[a]ctivity or condition [that] exists up to 1/3 of the time (0 - 2.5 hours a day in an 8-hour workday)").  This occupation's cognitive requirements included "[h]ighly skilled work, directing the activities of

others, influencing others, making judgments and decisions, dealing with people, [and]

performing a variety of duties." *Id.*

On June 28, 2018, Plaintiff met with neurologist and psychiatrist Cary Gunther, M.D.,

for a neuropsychiatric evaluation. *Id.* at 1:169, 2:99, 2:116-19, 5:114. In the "Assessment"

section of her appointment notes, Dr. Gunther wrote:

> This is a 59 year old man referred by [Dr. Eliach] for concern
> regarding his cognition, which has arisen in the context of
> professional and personal stressors. He does meet criteria for
> major depression and his in-office cognitive testing is consistent
> with the effects of depression. His personal sense of deficits as
> greater than testing suggests is also mood-congruent. He does
> not have high risk behaviors.

*Id.* at 2:119 (further capitalization omitted). Plaintiff thereafter met with Dr. Gunther

monthly. *Id.* at 2:218, 2:340; *see, e.g.*, *id.* at 2:112-15, 2:477-90 (appointment notes).

On September 11, 2018, Defendant approved Plaintiff's request for LTD benefits

under the LTD Plan, with benefits payable as of July 3, 2018. Def. RSOF ¶ 15. In a letter to

Plaintiff, Defendant stated that it "approved your benefits because you are unable to perform

the material and substantial duties of your occupation due to your medical condition of

depression. Your benefits will continue as long as you meet the definition of disability in the

policy provided by your employer and are otherwise eligible under the policy terms." Admin.

R. at 2:155. Defendant also noted that the LTD Plan "limits your benefits to 24 months due to

your medical condition of depression, if you continuously satisfy the definition of disability.

This means that if your medical records continue to support that you are unable to return to

work due to this condition, you will remain eligible to receive benefits for a maximum of 24

months based on this condition. This period will end on July 02, 2020." *Id.* On September

26, 2018, Defendant also approved Plaintiff's premium waiver under the Life Plan. Def.

RSOF ¶ 16. In a letter to Plaintiff, Defendant explained that "your Life Insurance coverage

will continue while you remain disabled subject to all terms and provisions of the Life

Insurance policy."  Admin. R. at 11:201.

On October 9, 2018, Plaintiff visited Dr. Stuart D. Saal, M.D.  *Id.* at 2:250.  Dr. Saal is

a nephrologist and a professor of clinical medicine at Weill Cornell Medical Center.  *Id.* at

5:32, 5:223.  Plaintiff's visit concerned three "chief complaint[s]," including "chronic kidney

disease."  *Id.* at 2:250 (capitalization omitted).  Dr. Saal's notes reflect that Plaintiff was

experiencing issues with "memory and concentration" associated with the colectomy and that

walking "provokes abdominal pain."  *Id.*  Plaintiff also visited Dr. Saal on December 13,

2018, *see id.* at 2:378-80, March 18, 2019, *see id.* at 3:289-92, and March 5, 2020, *see id.* at

6:104-06.

On November 15, 2018, Plaintiff informed Defendant that NYPH had terminated his

employment.  *See id.* at 2:216.  During a phone call with Defendant the next day, Plaintiff

stated that "[t]hings are not getting better," and that "[w]hen he gets dehydrated and gets

constipated it[']s really bad."  *Id.* at 2:217.  For example, about a week before the call,

Plaintiff "spent the entire 3 days on the toilet."  *Id.*  About two weeks before the call, Plaintiff

"had diarrhea that wouldn't stop" and spent "a good 6 hours every day in the bathroom."  *Id.*

"Memory and concentration problems continue[d]" to plague him as well.  *Id.* at 2:218.

Plaintiff reported similar physical and cognitive symptoms (in nature, frequency, and

severity) during subsequent calls with Defendant on January 25, 2019, *see id.* at 2:339-42;

March 25, 2019, *see id.* at 3:127-31; July 2, 2019, *see id.* at 3:356-59; October 11, 2019, *see

id.* at 4:164-66; and January 15, 2020, *see id.* at 5:32-33.  During the March 25 call, Plaintiff

mentioned that, as part of his new treatment plan, he had begun tracking his physical

symptoms.  *Id.* at 3:127.  According to this tracking, Plaintiff had been "[n]auseous for 24

days and vomited 11 times in that month."  *Id.*  Plaintiff further stated during the March 25

call that he was experiencing knee and ankle pain (a symptom that Plaintiff also reported in subsequent calls).  *Id.* at 3:128, 3:357, 4:164, 5:33.  During the July 2 call, Plaintiff noted that his doctors had discovered renal damage as well.  *Id.* at 3:356.

On November 20, 2018, Plaintiff visited endocrinologist Brian Schwartz, M.D., for diabetes treatment.  PSOF ¶ 20; *see* Admin R. at 2:244 (Plaintiff has had Type 2 diabetes since at least 2004).  Dr. Schwartz's notes stated that Plaintiff was "[s]till having nausea 3 times weekly, constipation, diarrhea, and frequent bowel movements."  Admin. R. at 2:244.

On December 22, 2018, the Social Security Administration (the "SSA") approved Plaintiff for federal disability ("SSDI") benefits.  Def. RSOF ¶ 21.  In accordance with an offset provision in the LTD Plan, the quantity of LTD benefits paid to Plaintiff was reduced by the amount of Plaintiff's SSDI benefits.  *Id.* ¶ 22.  Defendant requested a copy of Plaintiff's SSDI file from the SSA using an authorization dated March 25, 2019.  Admin. R. at 6:168.  On September 3, 2019, Defendant "received a rejection notice from the SSA rejecting the [submitted] authorization."  *Id.* at 4:93.  In an internal claim note entered on September 6, 2019, Defendant stated that "no additional action [was] needed at this time."  *Id.*

On March 20, 2019, Dr. Eliach advised Defendant that – based on her evaluation of Plaintiff on January 3, 2019 – Plaintiff was incapable of working at even a sedentary demand level due to abdominal pain, low energy, difficulty focusing, and uncontrolled diabetes.  *Id.* at 3:56-57; Def. RSOF ¶ 23.  Dr. Eliach retired shortly thereafter; her last appointment with Defendant was on April 29, 2019.  Admin. R. at 5:97.  During his phone call with Defendant on July 2, 2019, Plaintiff noted Dr. Eliach's retirement and stated that he would "continue to see the specialist until they figure out who is going to take [Dr. Eliach's] patients."  *Id.* at 3:356-57.

Plaintiff underwent an MRI exam of his right ankle and hindfoot on February 7, 2020. *Id.* at 5:90-92.  He did so at the request of Elisabeth Lachmann, M.D., a specialist in physical medicine and rehabilitation.  *Id.* at 3:120, 4:56, 5:90; PSOF ¶ 28.  According to the MRI impression, Plaintiff had a "[c]hronic nonunited avulsion fractures of the tip of the medial malleolus with associated scar remodeled deltoid ligament."  Admin. R. at 5:91.  In a letter to Defendant dated February 10, 2020, Dr. Lachmann opined that Plaintiff was "[u]nable to work standing & walking [for more than] ten minutes required for minimal sedentary work," and that Plaintiff was "[u]nable to tolerate sitting (chronic nausea & vomiting)."  *Id.* at 5:88.

Stephen Leverett, D.O., is employed by Defendant as an "in-house physician."  Def. Opp. at 12; *see also id.* at 18 (referring to Dr. Leverett as "Unum's reviewing physician").  He specializes in family medicine.  Admin. R. at 5:114.  On February 26, 2020, Dr. Leverett issued a report based on his review of Plaintiff's medical file.  *Id.* at 5:113-18.  Dr. Leverett opined that Plaintiff's "reports of functional impairment exceed[ed] the restrictions and/or limitations reasonably expected" based on several facts, including: (1) the lack of an "identifiable postoperative complication"; (2) the fact that there was "documentation of [a] normal gait and reports from [Plaintiff] of [the] ability to walk to the park, etc."; and (3) "[m]ultiple reports of activities" reflecting Plaintiff's "actual functional capacity," such as "enjoying woodworking hobby," "walking to the pharmacy or the local park," "participating in family activities including watching his son play baseball," "putting together his patio garden," being "active in stock market trading with [the] ability to 'focus during [the] trading day,'" "running errands up to 3-4 times a week," and "driving 'regularly without incident.'" *Id.* at 5:116-17.  Dr. Leverett concluded that "there is no condition or combination of conditions that would reasonably preclude" Plaintiff from performing his duties "on a full-time, sustainable basis."  *Id.* at 5:117-18.  On February 28, 2020, designated medical officer

Jamie Lewis, M.D., a specialist in physical medicine and rehabilitation, also reviewed Plaintiff's medical file and agreed with Dr. Leverett's analysis.  *Id.* at 5:122-23; DSOF ¶ 38.

### B.  Termination of Benefits and Internal Appeal

In a letter dated March 3, 2020, Defendant informed Plaintiff that it was terminating his LTD benefits.  Admin. R. at 5:132-40.  Defendant stated that it had "determined [that] as of March 04, 2020, you are able to perform the duties of your occupation.  Because you are not disabled according to the policy, benefits are no longer payable."  *Id.* at 5:133.  Defendant noted that Plaintiff had "report[ed] the ability to perform activities such as woodworking[,] walking to the park, post office, and pharmacy, as well as the ability to garden, participate in family activities, and the ability to be active in stock market trading."  *Id.* at 5:135.  According to Defendant, "[t]hese activities and the ability to focus during [the] trading day and driving without incident are consistent with sustained physical and mental dexterity and coordination."  *Id.*

In a letter dated March 6, 2020, Defendant informed Plaintiff that it was terminating his premium waiver.  *Id.* at 12:194-98.  Defendant explained: "Since our Long Term Disability department has determined you are not precluded from performing your own occupational demands, you do not meet the policy definition of disability for Life Insurance Premium Waiver.  Therefore, your claim has been closed."  *Id.* at 12:195.

Plaintiff appealed the LTD and Premium Waiver termination decisions on August 23, 2020.  *Id.* at 5:158-81; Def. RSOF ¶ 33.  Plaintiff stated, among other things, that: (1) his "garden" consisted of about 10 potted plants on his patio, which his wife and daughter helped him maintain; (2) his chronic ankle pain, abdominal pain, nausea, vomiting, and fatigue prevented him from extensively walking throughout large hospitals as his occupation required; (3) during a 30-day period spanning January and February 2020, he experienced

nausea on 29 days and vomiting on 20 days, including acute vomiting episodes during which

Plaintiff vomited 20-plus times in a 48-hour period; and (4) he continued to struggle with

focus, cognition, and memory.  Def. RSOF ¶ 33.  Plaintiff also contended that, although he

tried to engage in normal life activities as much as possible (per his doctors'

recommendations), his ability to perform such activities on an occasional basis did not mean

that he could work full-time in his prior role at NYPH.  *Id.*

In support of his appeal, Plaintiff submitted letters from four treating physicians.  In

the first letter, gastroenterologist Paul Basuk, M.D., stated that he had been treating Plaintiff

since January 2018 for "chronic" and "unrelenting" symptoms of "intractable nausea," as well

as abdominal pain and fecal incontinence.  *Id.* ¶ 34.  Dr. Basuk noted the "difficulty in

management" of Plaintiff's symptoms, as evidenced by his discussions with Plaintiff about

"obtaining medications not available in the United States."  Admin. R. at 5:194.

In the second letter, Dr. Gunther stated that Plaintiff had "engaged with his family and

participated in specified activities . . . at the urging of his physicians, including myself," and

that Plaintiff's participation in such activities "should be understood as the response of a

motivated patient to [his doctors'] treatment recommendations."  *Id.* at 5:206; Def. RSOF

¶ 35.  Dr. Gunther added:

> It is also inaccurate to say that there is no evidence of a
> cognitive deficit that could be attributed to [Plaintiff's] mental
> health.  I have repeatedly stated that [Plaintiff's] cognitive
> complaint is consistent with the known adverse effects of major
> depression on various aspects of cognition and most specifically
> on concentration.  The lack of finding of an organic dementing
> syndrome by no means negates the existence of a cognitive
> deficit secondary to a psychiatric diagnosis, in this case major
> depressive disorder.

Admin. R. at 5:206.

In the third letter, Dr. Saal stated that he was treating Plaintiff's "chronic kidney disease in the setting of monoclonal gammopathy, diabetes, diverticulitis, and hypertension." *Id.* at 5:223.  Dr. Saal opined:

> Medically, [Plaintiff] continues to present with postoperative complications related to the [January 2018] surgery and his chronic kidney disease.  These include a significant reduction in physical and mental stamina that makes it impossible for him to perform with the sustained acuity, memory function, and concentration his job duties require.  He does have occasional days where his function is closer to his previous baseline for short periods, but this improvement is unfortunately not frequent or reliable enough for him to return to active employment at this time.

*Id.*

In the fourth letter, Dr. Lachmann explained that in the preceding three-and-a-half years, Plaintiff had "developed complex regional pain syndrome (CRPS) affecting the right ankle." *Id.* at 5:210.  She reiterated her view (also expressed in her letter on February 10, 2020) that Plaintiff was "unable to perform his occupational demands required for minimal sedentary work because of Ankle CRPS and other conditions." *Id.*

After receiving Plaintiff's appeal, Defendant had two doctors conduct reviews of Plaintiff's medical file: Peter Brown, M.D. and Scott Norris, M.D. *Id.* at 6:167-72, 6:193-99. Dr. Brown is a psychiatrist. DSOF ¶ 47.  Upon reviewing Plaintiff's medical records, Dr. Brown issued his report on September 24, 2020. *Id.* Dr. Brown concluded that "[b]ehavioral health restrictions or limitations can be supported for the closed timeframe from the date of disability up to 04/18/19 but not beyond," Admin. R. at 6:171.  Dr. Brown stated that "[w]hile [Plaintiff] continues to have residual cognitive symptoms of depression (as is common in chronic depression) his mood has been stable, there is no report [of] difficulty with motivation

or energy level, and there is no report of impairment in any activities he chooses to perform." *Id.* at 6:172.

Dr. Norris is "an in-house file-reviewer who is employed by Unum." Pl. Br. at 17 (quotation marks and citation omitted); *cf.* Def. Opp. at 17-18 (defending Dr. Norris's opinions on other grounds, but not contesting Plaintiff's account of Dr. Norris's employment); Def. Reply at 16-20 (same). He is certified to practice family, occupational, and aerospace medicine. Admin. R. at 6:193. Upon reviewing Plaintiff's medical records, Dr. Norris issued his report on October 5, 2020. DSOF ¶ 49. Dr. Norris concluded that restrictions and limitations were not supported beyond March 3, 2020. *Id.* Dr. Norris asserted that Dr. Lachmann's views, as reflected in her submission in support of Plaintiff's appeal, were "highly inconsistent with other documented findings of the insured's gait or right LE findings including Dr. Saal's 3/5/20 exam." Admin. R. at 6:194.[3] Dr. Norris also stated, however, that he "d[id] not agree with Dr. Saal's 8/3/20 opinion submitted on Appeal," and that he would "attempt to contact [Dr. Saal] to discuss [Dr. Saal's] clinical rationale." *Id.* at 6:198.

In an addendum report dated October 13, 2020, Dr. Norris recounted his phone call that day with Dr. Saal. *See id.* at 6:213-16. According to Dr. Norris, Dr. Saal "stated that he was surprised that [Plaintiff] had such a difficult time following his abdominal surgery and noted that he would not have expected [Plaintiff] to have this level of disability following

---

[3] Dr. Norris further described Dr. Lachmann's letter as "highly irregular, as the note also referenced several documents that did not occur until a future date." Admin. R. at 6:194. This accusation apparently refers to the fact that although the letter lists the "Date of Service" as February 3, 2020, it references multiple documents postdating February 3, 2020. *Id.* at 5:210. But Dr. Lachmann's letter does not purport to have been *drafted* or *signed* on February 3, 2020, and the Court will not lightly infer that, as Dr. Norris implied, Dr. Lachmann's letter was somehow improperly drafted or submitted. The Court instead finds that the listing of February 3, 2020, as the "Date of Service" reflects that Dr. Lachmann's then-most recent appointment with Plaintiff was on February 3, 2020. *See, e.g.*, *id.* at 5:71-75, 5:93. The Court therefore rejects Dr. Norris's characterization of the letter as "highly irregular." *Id.* at 6:194.

bowel surgery or based on his Stage 3 [chronic kidney disease] and current renal function." *Id.* at 6:213.  Dr. Norris also recalled Dr. Saal stating that "if [Plaintiff] wanted to work, there was no reason that he could not do so based on his renal function."  *Id.*  When Dr. Norris "noted that records indicate that [Plaintiff] reported engaging in significant cognitive and physical activities," Dr. Saal apparently "indicated that he understood the apparent inconsistencies" but nonetheless "supported [Plaintiff] remaining out of work based on what [Plaintiff] reported to him."  *Id.*  This call did "not change[]" Dr. Norris's medical opinion. *Id.* at 6:214.  And because "[t]here was no change in [Dr. Saal's] opinion," Dr. Norris concluded that "a confirmatory letter is not necessary."  *Id.*

Plaintiff's appeal also prompted Defendant to enlist vocational consultant Kelly Marsiano to reevaluate the initial conclusion reached by Maxcy in mid-2018.  *Id.* at 5:256; DSOF ¶¶ 5, 42.  In a report dated September 8, 2020, Marsiano concluded that Plaintiff's vocational conclusion should be changed from "Director IT Operations" to "Operations Director."  Admin. R. at 5:256-58.  The two positions were identical with respect to their physical demands, as both require "[o]ccasional exertion up to 10lbs" and "mostly sitting, [with] brief periods of standing and walking."  *Id.* at 2:257; DSOF ¶ 42; *cf.* Admin. R. at 1:282.  But Plaintiff's "job duties required more than overseeing IT operations."  Admin. R. at 5:257.  As Marsiano explained, the "Operations Director" occupation "incorporates directing, developing, implementing and administering operations strategies and objectives to ensure the achievement of the organization's goals and objectives."  *Id.*  Compared to the "Director IT Operations" occupation, "Operations Director" is "more broad and incorporates the types of responsibilities the insured and the employer report.  It encompasses establishing and

maintaining policies and procedures, overseeing compliance and establishing and assessing the operating budget." *Id.*[4]

On October 15, 2020, Defendant informed Plaintiff that the benefits decision was upheld on appeal. DSOF ¶ 52. Defendant advised that Plaintiff could review and respond to the new information and rationale that Defendant used to uphold the decision. *Id.*

Over the next several months, Plaintiff repeatedly challenged Defendant's benefits decision to no avail. *Id.* ¶¶ 53-71. In support of these further challenges, Plaintiff submitted additional materials, including: (1) Plaintiff's log of episodes of nausea and vomiting that Plaintiff had maintained between February 2019 and November 2020, PSOF ¶ 41; (2) two medical reports from the SSA's disability file (one physical and one psychiatric; both conducted on October 26, 2018), *id.* ¶ 42; and (3) the SSA's "Disability Determination Explanation," *id.* ¶ 43.

### C. Procedural History

Proceeding under 29 U.S.C. § 1132(a)(1)(B), Plaintiff sued Defendant on August 15, 2022. Compl. With respect to the LTD Plan, Plaintiff requested: (1) "payment of disability benefits due [to] Plaintiff"; (2) "an order declaring that Plaintiff is entitled to immediate reinstatement to the LTD Plan, with all ancillary benefits to which he is entitled by virtue of his disability"; (3) in the alternative to the first two forms of relief sought, "an order remanding Plaintiff's claim to the claims administrator to the extent any new facts or

---

[4] In subsequent letters to Defendant, Plaintiff argued that "Operations Director" was an incorrect vocational conclusion. *See, e.g.*, DSOF ¶¶ 53, 58. In his briefing before the Court, Plaintiff does not take issue with the "Operations Director" vocational conclusion, so the Court assumes that it is correct. *See Rodriguez v. Carson*, 401 F. Supp. 3d 465, 470 (S.D.N.Y. 2019) ("A party may forfeit a right or defense by actively litigating other issues and forgoing the opportunity to litigate that right or defense." (brackets omitted) (quoting *Roberts v. Bennaceur*, 658 F. App'x 611, 616 (2d Cir. 2016) (summary order))).

submissions are to be considered"; (4) an award of attorney's fees and costs under 29 U.S.C.

§ 1132(g); and (5) pre-judgment and post-judgment interest. *Id.* at 6 (further capitalization

omitted).  Plaintiff requested the same relief under the Life Plan except, instead of requesting

payment of disability benefits, he sought "approval of the waiver of premium benefits

resulting in waiver of premiums under the Life Plan." *Id.* at 9 (further capitalization omitted).

Defendant answered on October 11, 2022.  Ans.  On March 31, 2023, the parties filed

cross-motions for judgment on the administrative record.  Pl. Br.; Def. Br.

## CONCLUSIONS OF LAW

### I.    Legal Standard

"[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed

under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the

plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *accord Metro. Life

Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  "When a plan gives an administrator such

discretion, a court may not overturn the administrator's denial of benefits unless its actions are

found to be arbitrary and capricious." *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 105 (2d Cir.

2017) (quotation marks and citation omitted).  Conversely, "[w]here an ERISA plan does not

accord an administrator discretionary authority to determine eligibility for benefits or to

construe the terms of the plan, a district court reviews all aspects of an administrator's

eligibility determination, including fact issues, *de novo*." *Locher v. Unum Life Ins. Co. of

Am.*, 389 F.3d 288, 293 (2d Cir. 2004) (quotation marks and citation omitted).  "[U]pon *de

novo* review, a district court may render a determination on a claim without deferring to an

administrator's evaluation of the evidence." *Id.* at 296.  "The question for the Court is simply

whether the decision to deny Plaintiff's claim was correct." *Kagan v. Unum Provident*, 775 F.

Supp. 2d 659, 670 (S.D.N.Y. 2011) (brackets, quotation marks, and citation omitted).  Under

*de novo* review, the plaintiff has the burden of proving by the preponderance of the evidence

that he is disabled within the meaning of the plan.  *See id.* at 671; *Critchlow v. First UNUM*

*Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004).

As noted, this case involves two distinct ERISA plans: the LTD Plan and the Life

Plan.  "ERISA plans are construed according to federal common law, and general principles

of contract law apply to their interpretation."  *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th

674, 687 (2d Cir. 2023) (quotation marks and citation omitted).  "A reservation of discretion

need not actually use the words 'discretion' or 'deference' to be effective, but it must be

clear."  *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108 (2d Cir. 2005).  "The plan

administrator bears the burden of proving that the deferential standard of review applies."

*Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).  The Court addresses each plan

in turn.

## II.  The LTD Plan

### A.  Standard of Review

As a threshold matter, the parties dispute whether the LTD Plan "gives [Defendant]

discretionary authority to determine eligibility for benefits or to construe the terms of the

plan."  *Firestone*, 489 U.S. at 115.  Plaintiff contends that benefits decisions under the LTD

Plan are subject to the Court's *de novo* review.  *See* Pl. Br. at 13; Pl. Opp. at 1-2; Pl. Reply at

1-2.  The Court agrees.

Defendant's sole argument for applying the deferential standard of review to the LTD

Plan is the LTD Plan's use of the word "determines" in its definition of disability.  *See* Def.

Opp. at 3; Admin. R. at 1:189 ("You are disabled *when Unum determines* that: [(1)] you are

limited from performing the material and substantial duties of your regular occupation due to

your sickness or injury; and [(2)] you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.  After 24 months of payments, you are disabled *when Unum determines* that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." (original emphases omitted; emphases added)).  As Plaintiff correctly notes, *Nichols* forecloses Defendant's interpretation.  *See* Pl. Reply at 1-2.  In *Nichols*, "[t]he plan state[d] that a disability 'exists when Prudential determines that all of these conditions are met' and then [went] on to list specific conditions." 406 F.3d at 108.  The Second Circuit held that "[t]he phrase 'when Prudential determines,'" by itself, "lack[ed] sufficient indicia of subjectivity" to satisfy the administrator's burden of proving that the deferential standard of review applied.  *Id.*; *see id.* ("To find discretion, we would have to read in language, effectively amending the provision to find disability 'when Prudential determines *to its satisfaction* that all these conditions are met.'  We therefore . . . hold that the plan vests no discretion in Prudential.").

Nichols* instructs that "language giv[ing] [the administrator] the power to make [a benefits] determination," but then listing "specific conditions requir[ing] that such power be exercised only in accordance with objective standards," does not suffice to vest discretion in the administrator.  *Id.*  Following *Nichols*, courts have repeatedly held that the word "determines," without more, requires *de novo* review rather than deferential review.  *See, e.g.*, *Quigley v. Unum Life Ins. Co. of Am.*, No. 22-cv-05906 (JPO), 2023 WL 6387021, at *4 (S.D.N.Y. Sept. 29, 2023); *Sevely v. Bank of N.Y. Mellon Corp. Long Term Disability Coverage Plan*, No. 17-cv-06207 (DAB), 2018 WL 8967296, at *1, *3-4 (S.D.N.Y. Sept. 26, 2018); *Est. of Bochniarz ex rel. Bochniarz v. Prudential Ins. Co. of Am.*, No. 11-cv-00867, 2015 WL 13745694, at *14-15 (W.D.N.Y. June 22, 2015), *report and recommendation*

*adopted*, 2015 WL 8516432, at *2-3 (W.D.N.Y. Dec. 11, 2015); *Wenger v. Prudential Ins. Co. of Am.*, No. 12-cv-01896 (KBF), 2013 WL 5441760, at *8-9 (S.D.N.Y. Sept. 26, 2013); *Durham v. Prudential Ins. Co. of Am.*, 890 F. Supp. 2d 390, 393-95 (S.D.N.Y. 2012); *Alexander v. Winthrop, Stimson, Putnam & Roberts Long Term Disability Coverage*, No. 04-cv-00760 (RJD), 2005 WL 8160040, at *8-9 (E.D.N.Y. Sept. 27, 2005); *see also, e.g.*, *Graziano v. First Unum Life Ins. Co.*, No. 21-cv-02708 (PAC), 2023 WL 4530274, at *1-2, *13 (S.D.N.Y. July 13, 2023) (parties agreed that *de novo* standard applied to Unum-issued plan whose relevant provisions were substantially identical to the relevant provisions in the LTD Plan and the Life Plan); *Glickman v. First Unum Life Ins. Co.*, --- F. Supp. 3d ----, 2023 WL 3868519, at *1, *3 (S.D.N.Y. June 7, 2023) (same for provision in LTD Plan); *Catania v. First Unum Life Ins. Co.*, No. 19-cv-00133, 2020 WL 2129374, at *1-2, *5 (N.D.N.Y. May 5, 2020) (same); *Doe v. Unum Life Ins. Co. of Am.*, 116 F. Supp. 3d 221, 223 (S.D.N.Y. 2015) (same); *cf. Pellegrino v. First Unum Life Ins. Co.*, No. 20-cv-00484, 2021 WL 3912238, at *3, *8 (N.D.N.Y. Sept. 1, 2021) (deferential standard of review applied due to inclusion of additional provision stating that Unum "has discretionary authority to determine a claimant's eligibility for benefits and to interpret the terms and provisions of the Plan" (brackets omitted)); *Hines v. First Unum Life Ins. Co.*, No. 14-cv-02961 (ER), 2016 WL 1246483, at *1, *11 (S.D.N.Y. Mar. 23, 2016) (similar).

Based on the *Nichols* line of cases and the absence of material differences between the plans in those cases and the LTD Plan at issue here, the Court holds that the LTD Plan is subject to *de novo* review.  The Court therefore "stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the

plaintiff has shown, by a preponderance of the evidence, that [the plaintiff] is entitled to benefits under the plan." *Quigley*, 2023 WL 6387021, at *4 (citation omitted).

### B. Benefits Determination

As noted above, the Court serves as "the finder of fact" in this "bench trial on the papers." *O'Hara*, 642 F.3d at 116 (quotation marks and citation omitted). Thus, the Court decides "whose testimony to credit and which of permissible inferences to draw," regardless of "whether those findings are based on witness testimony, or on documentary evidence, or on inferences from other facts." *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003). Further, on *de novo* review of an ERISA benefits determination, a district court is "free to evaluate [a treating physician's] opinion in the context of any factors it considered relevant, such as the length and nature of [the doctor-patient] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001). This "freedom of evaluation extends to the opinions of non-treating physicians who have not examined a plaintiff and base their opinions solely upon the documents in an insurance company's claim file." *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 253 (S.D.N.Y. 2005); *accord Clarke v. Aetna Life Ins. Co.*, No. 04-cv-01440 (RJH), 2009 WL 4259980, at *22 (S.D.N.Y. Dec. 1, 2009).

The core issue in this case is whether Plaintiff is "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury." Admin. R. at 1:189 (emphasis omitted). In deciding this issue, the Court finds that the medical opinions of Plaintiff's treating physicians (especially Drs. Basuk, Gunther, Saal, and Lachmann) are more probative of Plaintiff's health and capabilities than the medical opinions of Defendant's in-house file reviewers (namely, Drs. Leverett, Lewis, Brown, and Norris). To be sure, the Court – like the plan administrator in whose shoes it stands – is "not *obliged* to accord special

deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (emphasis added). But the Court "*may* give their opinions appropriate weight 'if it finds these opinions reliable and probative.'" *Barbu v. Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274, 289 (E.D.N.Y. 2014) (emphasis added) (quoting *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006)). On the facts of this case, the Court finds the medical opinions of Plaintiff's treating physicians more credible and persuasive for three reasons.

To begin with, "the length and nature of [the doctor-patient] relationship[s]" favor the opinions of Plaintiff's treating physicians. *Connors*, 272 F.3d at 135. Each of Drs. Basuk, Gunther, Saal, and Lachmann has treated Plaintiff for years and therefore has a greater degree of understanding of Plaintiff's capabilities, limitations, and credibility than Drs. Leverett, Lewis, Brown, and Norris, none of whom appear to have met (let alone medically examined) Plaintiff.

The ability to assess credibility is particularly significant here because several of Plaintiff's symptoms – including nausea, pain, and difficulty concentrating – rely to some extent on "subjective" evidence (as opposed to "objective" evidence). The Second Circuit "has long recognized that subjective complaints of disabling conditions are not merely evidence of a disability, but are an 'important factor to be considered in determining disability.'" *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (quoting *Connors*, 272 F.3d at 136). The probity of self-reported symptoms, however, depends on the credibility of the source. *See, e.g.*, *Connors*, 272 F.3d at 136-37. And "as compared to physicians who conduct only paper reviews, treating physicians are far better positioned to assess a claimant's credibility." *Hamid v. Metro. Life Ins. Co.*, 517 F. Supp. 3d 903, 917 (N.D. Cal. 2021) ("The fact that [Plaintiff's] treating physicians uniformly concluded he was

credible and disabled is thus strong evidence in his favor, even against the uniform conclusions of [Defendant's] consultants that he was not."); *accord Radmilovich v. Unum Life Ins. Co. of Am.*, --- F. Supp. 3d ----, 2023 WL 7457118, at *12 (C.D. Cal. Nov. 7, 2023) ("Courts generally give greater weight to doctors who have actually examined the claimant versus those who only review the file, especially when they are employed by the insurer as here." (quotation marks and citation omitted)); *Chicco v. First Unum Life Ins. Co.*, No. 20-cv-10593 (DLC), 2022 WL 621985, at *4 (S.D.N.Y. Mar. 3, 2022) ("It is also significant that none of First Unum's physicians personally examined Chicco.  By contrast, every medical professional that did examine Chicco found that she was unable to perform her job duties."); *Diamond v. Reliance Standard Life Ins. Co.*, 672 F. Supp. 2d 530, 537 (S.D.N.Y. 2009) ("[E]specially when the chief symptoms of the illnesses are subjective . . . [,] due weight should be given to the treating physician's findings since that physician has the most experience with the patient and his or her history with the symptoms of the illness."); *Kaminski v. UNUM Life Ins. Co. of Am.*, 517 F. Supp. 3d 825, 862 (D. Minn. 2021) (collecting cases where "courts have observed that assessing pain or other conditions with subjective symptoms may be best informed by physicians who see the claimant regularly and make in-person observations").

Defendant argues that its decision to terminate Plaintiff's LTD benefits was based on a preference for objective evidence over subjective evidence.  *See, e.g.*, Def. Br. at 26-29; Def. Opp. at 12-18.  It is true that, under deferential review, a plan administrator is "not required to accept [a plaintiff's] subjective complaints in the absence of objective evidence supporting disability," and that it is "reasonable for [a plan administrator] to require objective evidence to support [a plaintiff's] alleged physical limitations."  *Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 350 (E.D.N.Y. 2013) (citation omitted); *accord Hobson v. Metro. Life Ins. Co.*,

574 F.3d 75, 88 (2d Cir. 2009) ("[I]t is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability . . . [and] to require such evidence so long as the claimant was so notified.").  As noted, however, the Court's review here is *de novo*, so deferential-review cases such as *Topalian* and *Hobson* are not entirely on point.  In turn, "the Second Circuit has consistently recognized that as a general matter, objective findings are not required in order to find that an applicant is disabled.  Subjective pain may serve as the basis for establishing disability, even if unaccompanied by positive clinical findings of other objective medical evidence."  *Diamond*, 672 F. Supp. 2d at 536 (ellipsis, emphasis, quotation marks, and citations omitted); *accord Miles*, 720 F.3d at 486.  The Court therefore may properly consider the evidence submitted by Plaintiff even if the Court assumes that some of it falls into the category of subjective evidence.  That evidence, consisting of, among other things, the medical opinions of Plaintiff's four treating physicians, strongly favors finding Plaintiff disabled under the LTD Plan.

In its reply brief, *see* Def. Reply at 10, 14-15, Defendant highlights Dr. Gunther's note, during her initial assessment, that Plaintiff's "personal sense of deficits" was somewhat "greater than testing suggests," Admin. R. at 2:119; *see also id.* at 5:114 (Dr. Leverett quoting this statement in his February 26, 2020 report); *id.* at 10:117 (Defendant mentioning this statement in its denial of Plaintiff's appeal a year later).  According to Defendant, this note puts "Plaintiff's credibility . . . at issue" such that the Court should not consider Plaintiff's "subjective complaints."  Def. Reply at 14.  The Court disagrees.  To begin with, the fact that Plaintiff's depression intensified his negative perceptions of his own cognitive abilities does not mean that Plaintiff's *other* complaints were likewise "greater than testing suggests." Admin. R. at 2:119.  In other words, there is no clear reason to believe that Plaintiff's low

self-esteem impaired, for example, the subjective evidence regarding Plaintiff's pain and nausea.  Also, the note's very existence shows that Dr. Gunther was aware of, and thus able to account for, Plaintiff's potentially exaggerated sense of personal impairment – yet she nonetheless opined that Plaintiff suffers from "major depressive disorder" with consequential "adverse effects . . . on various aspects of cognition and most specifically on concentration." *Id.* at 5:206.

Defendant also attacks the probity of Dr. Saal's medical opinion on two principal grounds, neither of which persuades the Court.  First, Defendant notes that Dr. Saal personally examined Plaintiff only four times in two years.  *See* Def. Opp. at 13.  Dr. Saal's four in-person examinations of Plaintiff, of course, were four more than those performed by all of Defendant's file reviewers put together.  Also, Dr. Saal personally examined Plaintiff at least as recently as March 5, 2020, *see* Admin. R. at 6:104-06 – within five months of Dr. Saal's letter in support of Plaintiff's appeal dated August 3, 2020, *see id.* at 5:223.  This five-month period was an unusual one given the global COVID-19 pandemic and the resulting national emergency declared in March 2020.  That Dr. Saal had no in-person appointment with Plaintiff during that unprecedented time does not call Dr. Saal's medical opinion into question.

Second, Defendant makes much of Dr. Norris's recollection of his call with Dr. Saal. *See, e.g.*, Def. Br. at 31, 38-39; Def. Opp. at 14-15.  Although Plaintiff does not outright argue that this evidence is inadmissible, he does contend that its probative value is low.  *See* Pl. RSOF at 2 ("Dr. Norris' account of this alleged conversation does not quote Dr. Saal directly, and there is no way to surmise what, if anything, the treating physician actually said. Furthermore, the sentiments attributed to Dr. Saal by Dr. Norris are contradicted by Dr. Saal's *written* statement opining unequivocally that [Plaintiff] remained incapable of performing his

27

occupational duties." (citation omitted)); Pl. Opp. at 7-8 ("Absent any confirmation from Dr. Saal, Dr. Norris' vague, uncorroborated account of their alleged discussion should not be credited."). The Court agrees with Plaintiff that the probative value of Dr. Norris's recollection of his call with Dr. Saal is low and does not outweigh what Dr. Saal wrote in his letter in support of Plaintiff's appeal – let alone the other evidence presented by Plaintiff, such as the medical opinion of Dr. Basuk. *See, e.g.*, *Alfano v. CIGNA Life Ins. Co. of N.Y.*, 07-cv-09661 (GEL), 2009 WL 222351, at *19 (S.D.N.Y. Jan. 30, 2009) (assigning little weight to file reviewer's account of conversation with plaintiff's treating physician, given that "the accuracy and significance of this account are questionable"); *Wein v. Prudential Ins. Co. of Am.*, No. 03-cv-06526 (NGG), 2006 WL 2844176, at *14 (E.D.N.Y. Oct. 2, 2006) (plan administrator's "reli[ance] on an unsubstantiated hearsay conversation with [plaintiff's treating physician] to support its denial" was one fact that "demonstrate[d] a 'cherry-picking' of evidence in support of its determinations").[5]

Altogether, Defendant offers no sound reason for the Court to doubt the capabilities, credibility, or integrity of any of Plaintiff's treating physicians. The Court thus finds that this factor favors Plaintiff's treating physicians over Defendant's file reviewers. *See, e.g.*, *Stratton v. Life Ins. Co. of N. Am.*, 589 F. Supp. 3d 1145, 1175 (S.D. Cal. 2022) ("[T]he Court finds it appropriate to accord significant weight to the evaluations and opinions of Dr. Brizzie, who treated Plaintiff for a period of more than three years, from December 2016 through the LTD appeal, and who repeatedly and consistently opined that the physical abnormalities indicated

---

[5] *Straehle v. INA Life Insurance Co. of New York*, 392 F. Supp. 2d 448 (E.D.N.Y. 2005), relied upon by Defendant, *see* Def. Opp. at 15-16, is distinguishable. In *Straehle*, the medical opinions of the treating physician "were at least in part contradictory and changed significantly over time with no apparent explanation," and they were "inconsistent with the diagnoses of the many specialists [whom the plaintiff] consulted." 392 F. Supp. 2d at 459. That is not the case here.

in Plaintiff's MRI and x-rays were consistent with her subjective complaints of pain.");

*Thoma v. Fox Long Term Disability Plan*, No. 17-cv-04389 (RWS), 2018 WL 6514757, at

*28 (S.D.N.Y. Dec. 11, 2018) (on *de novo* review, finding it significant that "[b]oth of [the

plaintiff's] principal treating physicians have stated that [the plaintiff] is disabled from any

regular employment," and that "[t]hese physicians found [the plaintiff's] complaints to be

entirely credible and consistent with her lengthy medical history"); *Bigham v. Liberty Life

Assurance Co. of Bos.*, 148 F. Supp. 3d 1159, 1167 (W.D. Wash. 2015) ("Here, Ms. Bigham's

doctors *did* provide their medical opinions that her condition prevented her from performing

her occupation.  Furthermore, subjective symptoms have been found in previous cases to be

valuable evidence for a disability claim. . . .  [I]t is clear that Ms. Bigham's symptoms prevent

her from doing her job.  Liberty Life provides no credible reason to disbelieve the reports of

Ms. Bigham or her medical providers regarding her symptoms and their disabling

consequences." (citations omitted)); *Rao v. Life Ins. Co. of N. Am.*, 100 F. Supp. 3d 210, 221

(N.D.N.Y. 2015) (plan administrator may not "arbitrarily ignore credible medical evidence

simply because it comes from a claimant's treating source"); *Green v. Hartford Life &

Accident Ins. Co.*, No. 07-cv-01253, 2010 WL 3907823, at *7 (N.D.N.Y. Sept. 30, 2010)

("Defendant has offered no evidence or argument that puts Plaintiff's credibility in doubt,

choosing instead to focus on the lack of objective evidence.  Likewise, the Court's own

review of the record reveals nothing that would cause the Court to doubt Plaintiff or her

physicians.  Therefore, the Court concludes that . . . Plaintiff's complaints and statements

about her abilities and her condition, including her subjective claims, are credible and that her

treating physicians' opinions support such claims." (footnote omitted)).

Additionally, Plaintiff's treating physicians' areas of expertise are more relevant – and

thus their views are more persuasive – than those of Defendant's file reviewers.  *See Connors*,

272 F.3d at 135.  As noted above, Dr. Basuk is a gastroenterologist, Dr. Gunther is a

neurologist and psychiatrist, Dr. Saal is a nephrologist, and Dr. Lachmann is a specialist in

physical medicine and rehabilitation.  In comparison, Dr. Leverett practices family medicine,

Dr. Lewis specializes in physical medicine and rehabilitation, Dr. Brown is a psychiatrist, and

Dr. Norris practices family, occupational, and aerospace medicine.  Although there is some

overlap between the two groups in terms of their areas of expertise, the Court finds it

noteworthy that two of Plaintiff's treating physicians (Dr. Basuk and Dr. Saal) specialize in

abdominal health – a particularly relevant field in assessing the long-term effects of a

colectomy after which a plaintiff reports frequent and severe bouts of nausea and vomiting –

whereas the same cannot be said of any of Defendant's in-house file reviewers.  Hence, the

Court finds Dr. Basuk and Dr. Saal's views particularly compelling.  *See, e.g.*, *Gary v. Unum*

*Life Ins. Co. of Am.*, 831 F. App'x 812, 814 (9th Cir. 2020) ("[Defendant] also only hired

consultants specializing in orthopedic surgery, family medicine, and psychology to assess

[Plaintiff's] claim – not an [Ehlers-Danlos Syndrome] specialist." (emphasis omitted)); *Tam v.*

*First Unum Life Ins. Co.*, 491 F. Supp. 3d 698, 709 (C.D. Cal. 2020) ("Unum erred in relying

on the opinions of five doctors who did not examine plaintiff and had no experience or a

specialization in the [relevant medical areas] over the opinions of the doctors who examined

plaintiff."); *Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp. 2d 724, 735 (S.D. Tex.

2005) ("While an administrator need not employ specialist physicians to review claims, the

level of deference due [to] nurses should generally be less than that extended to doctors whose

professions concentrate in the relevant field." (citation omitted)).

Further, the opinions of Plaintiff's treating physicians are more "compatib[le] . . . with

the other evidence" in the record.  *Connors*, 272 F.3d at 135.  The Court finds credible, and

accepts, Plaintiff's representations that he continues to experience nausea on a near-daily

basis, that he vomits multiple times a week (including occasional episodes of acute vomiting), that he is incapable of standing and walking for significant periods of time, and that these and other physical ailments impair his ability to concentrate. *See, e.g.*, PSOF ¶¶ 26-28. Such facts strongly support the conclusion of Plaintiff's treating physicians that Plaintiff is "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury." Admin. R. at 1:189 (emphasis omitted).

The Court finds unpersuasive Defendant's in-house file reviewers' conclusions to the contrary. Many of the facts that file reviewers such as Dr. Leverett highlighted – including "walking to the pharmacy or the local park," "watching his son play baseball," "running errands up to 3-4 times a week," and maintaining a "garden" of about 10 potted plants on the patio with his wife and daughter's help, *id.* at 5:117, 5:165 – do not meaningfully correlate with the relevant requirements of Plaintiff's vocation. Simply put, the Court does not believe that Plaintiff's efforts to participate in rudimentary activities establish his ability to serve as an "Operations Director." *See, e.g.*, *Khan v. Provident Life & Accident Ins. Co.*, 386 F. Supp. 3d 251, 271 (W.D.N.Y. 2019) ("Dr. Paty in particular cited Plaintiff's ability to read, use the computer, do occasional household chores, and grocery shop. There is, quite obviously, nothing inherent in these activities that proves Plaintiff has the ability to perform the exertional and cognitive demands of a hospital neurologist, much less to do so eight hours a day, five days a week, or, during the periods when he was 'on call,' to be able to do them twenty-four hours a day, seven days a week, if necessary."); *Lyttle v. United of Omaha Life Ins. Co.*, 341 F. Supp. 3d 1071, 1085 (N.D. Cal. 2018) ("That [Plaintiff] and his wife were in some capacity assisting their parents and that he continued to do small home improvement tasks and manage his investments (to some unknown capacity) does not mean that he could perform the demanding functions of a VP of Chemistry with reasonable continuity."

(emphasis omitted)); *Young v. United of Omaha Life Ins. Co.*, 165 F. Supp. 3d 984, 990 (E.D. Wash. 2016) ("Plaintiff's ability to walk for 30 minutes with her dog does not contradict her claim of inability to work full-time as a Database Systems Engineer." (further hyphen omitted)); *Mead v. ReliaStar Life Ins. Co.*, 755 F. Supp. 2d 515, 534 (D. Vt. 2010) ("The appeal committee cited the evidence that Mead takes little or no pain medication, is active, can knit and crochet, and has not demonstrated to her doctors overt signs that she is in pain. The problem with this evidence is that it doesn't challenge the conclusion that Mead experiences severe pain when performing the functions of a full-time sedentary job.  Her level of physical activity has little to do with the essential duties of a sedentary occupation."); *Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 949 (D. Ariz. 2010) ("Perryman's ability to perform limited and sporadic activities of daily living are consistent with CFS and do not establish that Perryman can perform sedentary work on a sustained basis.").

*          *          *

In sum, the Court concludes that Plaintiff is "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury," namely, his continuing issues with debilitating nausea, pain, and concentration.  Admin. R. at 1:189 (emphasis omitted).  And it is uncontested that Plaintiff has experienced "a 20% or more loss in [his] indexed monthly earnings due to the same sickness or injury."  *Id.* (emphasis omitted). Plaintiff is therefore entitled to a reinstatement of the LTD Plan benefits that he should have received between the termination of Plaintiff's coverage on March 3, 2020, and the conclusion of the first 24 months of payments under the LTD Plan.

Plaintiff's potential entitlement to coverage under the LTD Plan after that 24-month period, however, requires further development and consideration.  As Plaintiff correctly notes,

the definition of "disabled" stated in the previous paragraph was the "definition in effect when LTD benefits were terminated." Pl. Br. at 14. But that definition applies only for the first 24 months of payment; after that point, someone is "disabled" under the LTD Plan "when Unum determines that due to the same sickness or injury, [the individual is] unable to perform the duties of any gainful occupation for which [the individual is] reasonably fitted by education, training or experience." Admin. R. at 1:189. Indeed, Defendant represents that it "has not had occasion to comment on or evaluate Plaintiff's claim under the context of 'any gainful occupation' as Plaintiff did not establish proof of disability for the 24-month 'regular occupation' period." Def. Reply at 2 n.1.

Given the present state of the record, the Court concludes that, with respect to Plaintiff's LTD Plan benefits postdating the initial 24-month period, this case should be remanded to Defendant to promptly decide the issue in the first instance, after which a court may (if necessary) review that decision under the applicable standard of review. *See, e.g.*, *Santorelli v. Hartford Life & Accident Ins. Co.*, 624 F. Supp. 3d 143, 149 (D. Conn. 2022) (remanding "for the limited review of whether working in an office is an 'essential duty' of [the plaintiff's] occupation" because of "how sparse the record [wa]s" on this point); *Easter v. Cayuga Med. Ctr. at Ithaca Prepaid Health Plan*, 217 F. Supp. 3d 608, 634 (N.D.N.Y. 2016) (remanding where there was "insufficient information in the administrative record upon which to determine whether [the] [p]laintiffs are entitled to benefits"); *cf. Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) ("[R]emand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." (quotation marks and citation omitted)).

### III.    The Life Plan

#### A.  Standard of Review

The parties agree that "[t]he Life Plan gives Unum 'discretionary authority to make benefit determinations' under the terms of the Life [Plan]."  Def. RSOF ¶ 6 (quoting Admin. R. at 11:43).  Thus, the deferential standard of ERISA review applies.  "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits.  It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"  *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone*, 489 U.S. at 111).  Under this standard, "a court may overturn a plan administrator's decision only if the decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law."  *Novella v. Westchester County*, 661 F.3d 128, 140 (2d Cir. 2011) (brackets, ellipsis, and citation omitted).

#### B.  Benefits Determination

The sole reason given by Defendant for discontinuing Plaintiff's premium waiver under the Life Plan was that Defendant's "Long Term Disability department ha[d] determined [that Plaintiff was] not precluded from performing [his] own occupational demands."  Admin. R. at 12:195.  As the Court just explained, however, Defendant's determination regarding Plaintiff's LTD benefits was erroneous.  Defendant's justification for its discontinuation of Plaintiff's premium waiver is thus literally "without reason" and therefore subject to the Court's reversal.  *Novella*, 661 F.3d at 140 (citation omitted); *see, e.g.*, *Delprado v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 12-cv-00673, 2015 WL 1780883, at *37 (N.D.N.Y. Apr. 20, 2015) ("Since the decision that Plaintiff was not disabled under her second STD claim for fibromyalgia was arbitrary and capricious, the decision to deny her contingent LTD claim was also unreasonable.").

Plaintiff is therefore entitled to a reinstatement of the premium waiver for the Life Plan that he should have received between the termination of Plaintiff's coverage on March 3, 2020, and the conclusion of the first 24 months of payments under the LTD Plan (as well as thereafter if Defendant determines on remand that Plaintiff qualifies as "disabled" under the definition that applies after the initial 24-month period).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the administrative record is **GRANTED** and Defendant's motion for judgment on the administrative record is **DENIED**. Judgment will therefore be entered in favor of Plaintiff to the extent stated in this opinion; the case will otherwise be remanded to the Defendant. Within **seven (7) days** of this order and opinion, Plaintiff shall submit a proposed judgment. Within **twenty-eight (28) days** of this order and opinion, Plaintiff may file a motion for attorney's fees and costs under 29 U.S.C. § 1132(g). The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 35 and 36.

Dated:  March 26, 2024
        New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge